# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| DANIEL S. PORTER, | Case No. 3:22-cv-00089-MMD-CLB |
| Petitioner, | ORDER |
| v. | |
| NETHANJAH BREITENBACH, *et al.*, | |
| Respondents.[1] | |

## I.    SUMMARY

Petitioner Daniel S. Porter filed a counseled Third Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 27 ("Petition").) In 2016, a Nevada jury convicted Porter of three counts of Sexual Assault, Battery with Intent to Commit Sexual Assault, First-Degree Kidnapping, and Robbery—each with Use of a Deadly Weapon—and he was sentenced to an aggregate of 62 years and 1 month to life imprisonment. (ECF No. 10-9 at 3-4.) Porter alleges violations of his rights (1) to effective assistance of trial and appellate counsel under the Sixth Amendment, (2) Fifth Amendment Due Process based on trial court error, insufficient evidence to support the convictions, and cumulative error; and (3) against disproportionate sentencing under the Eighth Amendment. (ECF No. 27.) For the reasons discussed below, the Court denies the Petition and grants a Certificate of Appealability on Grounds 1, 4, 5, 7, and 8.

---

[1]Porter is currently incarcerated at Lovelock Correctional Center (LCC). *See* NDOC Inmate Search, https://perma.cc/4JPD-TNCN. Nethanjah Breitenbach is the current warden for that facility. *See Lovelock Correctional Center Facility*, Nevada Department of Corrections, https://perma.cc/73ZR-9VA6. At the end of this Order, the Clerk of Court is directed to substitute Porter's current immediate custodian, Nethanjah Breitenbach, as the Respondent in lieu of Garrett. *See* Fed. R. Civ. P. 25(d).

## II.    BACKGROUND

### A.    Facts Underlying the Offenses

On June 6, 2015, S.D. lived with her husband, Gregorio Mendoza, mother, Teresa Diaz, and three-year old son. (ECF No. 35-2 at 17-18.) S.D. had consumed opiates and amphetamines. (*Id.* at 19, 98-99, 157.) At around 11:30 p.m., she arrived home and parked her Honda Accord in front of her driveway. (*Id.* at 18-23.) The doors of the Honda unlocked automatically when she turned off the engine. (*Id.* at 24.)

S.D. was sitting in her vehicle, absorbed with her cellphone, when a black man opened the passenger door and pointed a gun at her head. (*Id.* at 23-24.) She later described his clothing and that he was "stocky," and 5'6. (*Id.* at 24-26.) He had a tattoo under his wristwatch, and she noticed his mustache because, although he wore "a shirt that he put over his head, and then he put his hat over it so it would hold onto the shirt," he had to hold the shirt over his face and it kept coming down, so she "was able to see his face." (*Id.*) The gun was black and had a slide "like a .9mm." (*Id.*) At trial, S.D. identified Porter as her assailant. (*Id.*)

Porter told S.D., "Give me your money," and she told him she had none. (*Id.* at 27.) She was holding her Galaxy S6 Edge cellphone, and he said, "Give me your phone," so she did. (*Id.* at 27, 83-84.) Porter got inside the vehicle, closed the door, and rested his hand holding the gun on the middle console pointing at her stomach. (*Id.* at 27.) He removed her brown Coach wallet from her purse and found her ID, ATM card, NetSpend Card, and prepaid credit cards. (*Id.* at 27-28.)

While holding the gun toward her stomach, Porter questioned S.D. about her family and learned her mother and son were inside the house. (*Id.* at 28-30.) He asked if she had jewelry or money inside the house and she told him, "No." (*Id.*) He told her she needed to find a way to get him money and she started crying out of fear. (*Id.* at 29-30.) Three teenagers came toward the car and Porter warned S.D. that if she screamed or made a sudden movement, he would kill her and the teenagers. (*Id.* at 30-31.) S.D. did not try to signal the teenagers because, the gun started touching her and she was too

2

scared. (*Id.*) Porter pulled S.D.'s ATM card from her wallet and, still pointing the gun at her, directed her to drive to the bank to see if she had money. (*Id.* at 32-33.)

S.D. drove a short distance when Porter directed her to pull over. (*Id.* at 35-36.) He held the gun in one hand and touched her breasts with the other while looking for cash. (*Id.* at 37-38.) He instructed her to slide her seat back so he could look underneath it for money, and when he didn't find any, he ran his hand up her leg and unbuttoned her shorts. (*Id.*) She told him "Please don't touch me," she was married, had a son, and might be pregnant, but he replied, "Shut up, bitch. I don't care." (*Id.* at 38-39.) He put his hand under her underwear, and she tightened her legs so he could not "get in." (*Id.*) He told her to open her legs, and asked her, "Would you rather get killed or dicked down?" (*Id.*) She stopped tightening her legs and, claiming he was looking for money, he "stuck" two fingers inside her vagina. (*Id.* at 40.) He told her to pull down her shorts and she did so because she figured if she didn't, he would kill her and enter her house with her keys. (*Id.* at 41.) He never let go of the gun. (*Id.*)

Porter instructed S.D. to kneel on the driver's seat facing away from him. (*Id.* at 41-44.) She told him not to touch her, and promised to let him inside her house because she didn't want him to kill her, but he told her to be quiet. (*Id.* at 45-46.) While kneeling on the seat, she sat down, and he slapped her right buttock with his hand, and she kneeled back up. (*Id.* at 44-45, 90.) She wore thong underwear, and he may have "slid the thong over." (*Id.* at 92.) He tried to stick his penis in her anus, but she screamed in pain, and he pulled out, saying, "Sorry." (*Id.* at 46.) He "kind of went" inside her anus again accidentally, said, "Shut up, bitch," hit or pushed her head with the gun, and put his penis all the way inside her vagina for a minute or two. (*Id.* at 46-47, 80, 103-05.) She believed he "finished" because he asked her for a wipe. (*Id.* at 45-47.) She had wipes in her makeup bag. (*Id.* at 47-48.) He cleaned his hands and used the wipe to clean the passenger door and glove compartment. (*Id.* at 48-49.)

He allowed her to put her shorts back on and asked if she had any speakers; he mentioned "Infinity," as if he already knew she had Infinity speakers inside the trunk of

3

her vehicle. (*Id.* at 49-51.) He directed her back to the house at gunpoint, where he told her to open the car trunk. (*Id.* at 51-53.) Porter exited the vehicle with S.D.'s cellphone, camera (which had been in the center console), turquoise purse, which contained her Coach wallet, ATM card, and her mother's bank account information on a check, but left her makeup bag. (*Id.* at 53-54, 59, 66-68, 79.) She heard him remove the speakers. (*Id.*)

S.D. hurried out of her vehicle when he left, and saw, from a distance, that his vehicle looked like an older model dark blue or black two-door Honda Civic. (*Id.* at 54-55.) She went inside her house and called 9-1-1. (*Id.* at 56-57.) During the call, S.D. said she thought her assailant was her ex-boyfriend—but police later verified he was in prison at the time—and S.D. later explained that Porter sounded like her ex-boyfriend and had fingernails and hands like him. (ECF Nos. 35-2 at 58-59, 84-85; 35-5 at 95.)

A Las Vegas Metropolitan Police Department (Metro) patrol officer immediately responded to S.D.'s call. (ECF No. 35-2 at 110.) The officer wore a body camera and found S.D., crying "pretty hysterically." (*Id.* at 111.) The officer called paramedics because S.D. was hyperventilating. (*Id.* at 113.) The officer's body camera recorded their entire conversation. (*Id.* 113-15, 119.)

S.D. was taken to University Medical Center where she underwent a Sexual Assault Nurse Examination (SANE). (*Id.* at 63-64, 117, 125, 139.) S.D. told the SANE nurse she was sexually assaulted "doggy style" in a vehicle by a man using a gun at about 12:10 a.m. (*Id.* at 140-41, 160.) S.D. told the nurse her assailant inserted his finger and penis into her vagina and inserted his penis into her rectum. (*Id.* at 141-42.) S.D. told the nurse the assailant ejaculated on himself. (*Id.* at 143.) S.D. told the nurse she did not change clothes, urinate, defecate, brush her teeth, or consume food or beverages after the assault. (*Id.* at 143-44.) The SANE nurse took swabs of "the back of the throat, the buccal area of the cheek, the hands and the nails . . . the vagina, the vaginal walls, cervical os of the uterus, rectum, [and the] cheek of her buttock." (*Id.*) The nurse found menstrual blood on S.D.'s underpants. (*Id.* at 146.) The nurse testified, "when fluids come out of the vagina from menstrual blood, you may be moving DNA out of the vagina onto a tampon

4

or onto a Peri-Pad or onto underwear." (*Id.* at 137.) The nurse found a contusion caused by blunt force trauma on S.D.'s left thigh and S.D. confirmed it was not present before the assault. (*Id.* at 146-48.) The nurse found no signs of blunt force trauma on the external genitalia, the vaginal walls, or cervical os of the uterus. (*Id.* at 150.) S.D. experienced pain during the rectal examination, and the nurse found three acute lacerations to her anus. (*Id.* at 65, 152-53, 157.) The nurse found no other lacerations, contusions, abrasions, or swelling on S.D.'s body. (*Id.* at 162-63.)

A Metro crime scene analyst took S.D.'s Honda to the lab. (*Id.* at 165-73.) She found one fingerprint on the exterior of the front passenger door but none inside. (*Id.* at 173-74.) That fingerprint matched Alberto Gonzalez, a Hispanic, light-skinned, 5'7" to 5'8," 150-pound male, who repaired vehicles. (ECF No. 35-5 at 97-98.) Police later ruled out Gonzalez's DNA type against the items collected from S.D. (*Id.* at 98.) The crime scene analyst found no fingerprints on the makeup bag because the powder she placed on it revealed "smudges and smears all over the outside of it." (ECF No. 35-2 at 176-77.)

Ebonee Dawson lived with Porter and noticed he returned home between 11 p.m. and 1:00 a.m. one night in June 2015, with a "teal" colored purse. (ECF No. 36-4 at 33-35.) Dawson noticed Porter had a Galaxy S6 cellphone, and saw Porter go through the purse which contained a debit card, credit cards, Alliance card, NetSpend card, and ID in S.D.'s name, a burgundy digital camera, and checks in the name Teresa Diaz. (*Id.* at 35-38.) The purse contained a Coach wallet and drugs. (*Id.*) Dawson was suspicious Porter was cheating on her, so she went through the phone, found no communications with Porter, but noted S.D.'s Facebook account stated something had happened to S.D. (*Id.* at 38-39.) Dawson used Teresa Diaz's banking information, and S.D.'s personal information, to pay a Nevada power bill and obtain $350. (ECF No. 35-5 at 9-18, 98-108.)

On July 24, 2015, as part of a financial crime investigation, Metro conducted a search warrant at Porter's residence. (*Id.* at 20-25, 36-37.) They found mail and other documents identifying Porter and Dawson as the occupants. (*Id.* at 30-31, 109.) They found a loaded .9mm black handgun, two compatible magazines, and a box of

ammunition, but no usable fingerprints or DNA on them. (*Id.* at 28-30, 46, 50.) Metro found S.D.'s IDs and credit cards, and checks in the name of Teresa Diaz made payable to Dawson. (*Id.* at 31-32, 39-40.) Porter was 5'7" and weighed 160-65 pounds. (*Id.* at 113.) A search warrant was obtained for Porter's buccal swab. (*Id.* at 110-11.) Metro detectives discovered Porter conducted an internet search for "10-inch Infinity speakers" on June 26, 2015. (*Id.* at 56-57.) Metro was unable to locate S.D.'s cellphone. (*Id.* at 92-93.)

The State's DNA Analyst found sperm and semen on S.D.'s vaginal swabs, including a sperm fraction with an indistinguishable DNA mixture of two individuals, including "at least one" male, and S.D.'s husband, Mendoza, could not be excluded as a partial contributor to the mixture. (*Id.* at 134-36.) The cervical swabs contained semen and sperm, and the sperm fraction contained a mixture of DNA for at least two individuals, including one male, but insufficient information to make comparisons. (*Id.* at 137-38.) The rectal swabs contained semen and a partial DNA profile consistent with one person but insufficient information to draw a conclusion. (*Id.* at 138-39.) The swabs from S.D.'s right thigh indicated semen, but a DNA profile could not be obtained from the sperm fraction. (*Id.* at 139-40.) The right buttock swab was semen and sperm negative. (*Id.* at 140-41.) S.D.'s underwear had semen and sperm, and Porter and Mendoza could not be excluded as possible contributors to the major mixture DNA profile; the probability of randomly selecting an unrelated individual from the general population who could be included in the major mixture was about one in 885 million. (*Id.* at 141-42.)

### B.     Procedural Summary

A jury found Porter guilty of (1) three counts of sexual assault with the use of a deadly weapon, (2) battery with the intent to commit sexual assault with the use of a deadly weapon, (3) first-degree kidnapping with the use of a deadly weapon, and (4) robbery with the use of a deadly weapon. (ECF No. 10-9 at 2-3.) Porter was sentenced to an aggregate of 62 years and 1 month to life imprisonment. (*Id.* at 3-4.) He unsuccessfully sought state-court review. (ECF Nos. 10-15; 10-21; 10-26.)

## III.   GOVERNING STANDARDS

### A.   Antiterrorism and Effective Death Penalty Act (AEDPA)

The AEDPA sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Under 28 U.S.C. § 2254(e)(1),

7

state court factual findings are presumed correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A federal habeas court may not consider evidence beyond the state-court record unless a petitioner satisfies 28 U.S.C. § 2254(e)(2).[2] *See Shinn v. Ramirez*, 596 U.S. 366, 375-76 (2022) ("[O]nly rarely may a federal habeas court hear a claim or consider evidence that a prisoner did not previously present to the state courts in compliance with state procedural rules."). For purposes of § 2254(e)(2), the term "fail" means the prisoner must be "at fault" for the undeveloped record in state court. *See Williams v. Taylor*, 529 U.S. 420, 432 (2000) ("[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.") "Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435. "[A] person is not at fault when his diligent efforts to perform an act are thwarted, for example, by the conduct of another or by happenstance." *Id.* at 432.

---

[2]The requirements of § 2254(e)(2) are:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

    (A)    the claim relies on—
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B).

Under 28 U.S.C. § 2254(e)(2), a petitioner is entitled to an evidentiary hearing if he presents a "meritorious claim", and he exercised reasonable diligence in developing the factual record in the state proceedings. *See Williams*, 529 U.S. at 434-37. The Ninth Circuit has held that "[a] habeas petitioner must meet two conditions to be entitled to a federal evidentiary hearing: He must (1) allege facts which, if proven, would entitle him to relief, and (2) show that he did not receive a full and fair hearing in a state court, either at the time of the trial or in a collateral proceeding." *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003) (citing *Belmontes v. Woodford*, 335 F.3d 1024, 1053-54 (9th Cir. 2003)). Thus, an evidentiary hearing need not be held if a court "is able to determine without a hearing that the allegations are without credibility or that the allegations if true would not warrant a new trial . . . ." *Id.* (citing *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir. 1991)).

### B.   Standards for Evaluating Ineffective Assistance of Counsel (IAC)

A petitioner claiming IAC has the burden to demonstrate (1) the attorney made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 687 (1984).

To establish ineffectiveness, the defendant must show counsel's representation fell below an objective standard of reasonableness. *See id.*, 466 U.S. at 687-88. Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, to avoid the distorting effects of hindsight. *See id.* at 689. The petitioner bears the burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *See id.* An attorney must make a reasonable investigation in preparation for trial, or a reasonable decision not to investigate. *See id.* "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Federal review of a state court's decision on an IAC claim is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009)). A reviewing court must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (citation modified). To establish prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.*

### C.    Standards for Evaluating Procedural Default of IAC Claims

"A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn*, 596 U.S. at 371. Where a petitioner fails to do so and therefore "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

For IAC claims involving trial counsel, a petitioner may establish cause, thereby excusing procedural default "where (1) the claim of ineffective assistance of trial counsel [is] a "substantial" claim; (2) the "cause" consist[s] of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14, 18 (2012)).

In *Martinez*, the Supreme Court stated the standard for issuing a Certificate of Appealability as analogous support for whether a claim is substantial. *See Martinez*, 566 U.S. at 14. Under that standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citation modified). An IAC claim against trial counsel "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14-16 (citing *Miller-El*, 537 U.S. 322).[3]

"[T]he standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying [*Strickland*] claim." *Leeds v. Russell*, 75 F.4th 1009, 1017 (9th Cir. 2023) (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022) ("[A] conclusion on the merits of [a trial counsel IAC] claim under *Strickland* holds a petitioner to a higher burden than required in the *Martinez* procedural default context, which only requires a showing that the [trial counsel IAC] claim is 'substantial.'")). Review of trial counsel's actions in a *Martinez* prejudice analysis is conducted "under a more relaxed standard", while the *Strickland* standard is applied "with full force" when considering actions of postconviction review counsel under a *Martinez* analysis. *Id.* at 1022. Although the requirements are distinct, "[t]he analysis of whether both cause and prejudice are established under *Martinez* will necessarily overlap, since each considers the strength and validity of the underlying ineffective assistance claim." *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019) (citation modified), reversed on other grounds by *Shinn*, 596 U.S. 366. If a petitioner can show cause and prejudice to excuse a procedural default, a federal court may consider the claim *de novo*. *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (citing *Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002)).

---

[3]Nevada prisoners must raise IAC claims involving trial counsel in an initial state postconviction petition, which is the initial collateral review proceeding for purposes of applying *Martinez*. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

## IV.    DISCUSSION

### A.    Ground 1.1—IAC—Failure to Investigate S.D. and DNA Expert

Ground 1.1 alleges trial counsel provided ineffective assistance by failing to (A) investigate S.D., and (B) investigate the DNA evidence and hire a DNA expert. (ECF No. 27 at 27-36.)

#### 1.    Ground 1.1(A)—IAC—Failure to Investigate S.D.

Porter alleges trial counsel failed to investigate S.D., and S.D. "suffer[ed] from a serious drug problem," and her "memory was entirely suspect" because she initially mentioned her ex-boyfriend as a suspect, even though he was in prison at the time of the crimes. (ECF No. 27 at 27-28.) Respondents contend this claim was not fairly presented to the state courts and should be dismissed as unexhausted; or alternatively, the claim lacks merit. (ECF No. 73 at 24-27.) Porter contends he can overcome his procedural default of this claim under *Martinez*. (ECF No. 80 at 32-39.)

At trial, S.D. and the SANE nurse testified S.D. tested positive for opiates and amphetamines several hours after the assaults. (ECF No. 35-2 at 19, 98-99, 157.) S.D. testified she consumed nothing after the attack and before the SANE examination. Porter's girlfriend, Dawson, testified she saw drugs inside S.D.'s purse. There was evidence that S.D. initially believed her ex-boyfriend was her assailant, but police verified he was in prison at the time of the offenses. Trial counsel cross-examined S.D. about her drug use and asked her "was there anything . . . that would have impaired your ability to perceive what transpired that evening?" and when S.D. replied, "No," counsel elicited testimony about the drugs she'd consumed that night. (ECF No. 35-2 at 97-99.) In closing remarks, defense counsel argued S.D. was "under the influence" and had "greater than 300 nanograms of amphetamines in her system at the time," and asked the jury to take that into account in determining her ability to see and perceive. (ECF No. 36-4 at 77-78.) At sentencing, the State acknowledged S.D. had a substance abuse problem and suggested it occurred due to her prescribed use of opiates and Porter's crimes against her. (ECF No. 36-10 at 5.)

12

Ground 1.1(A) is insubstantial because Porter fails to explain that—beyond the information presented at trial—additional information about S.D.'s drug usage existed. Moreover, trial counsel conducted cross-examination and made arguments to the jury about S.D.'s drug use and its possible effect on her memory. The claim that counsel performed deficiently is wholly without factual support. Thus, Ground 1.1(A) is dismissed as procedurally defaulted. *See Martinez*, 566 U.S. at 14.

### 2.    Ground 1.1(B)—IAC—Investigate DNA Expert (New Evidence)

Porter alleges trial counsel provided ineffective assistance by failing to investigate the DNA by hiring a DNA expert. (ECF No. 27 at 27-36.) Respondents contend Porter failed to exhaust this claim, and it is predicated, in part, on evidence not developed during the state court proceedings, i.e., Porter's Exhibits 26-28. (ECF No. 73 at 22-27.) They contend this new evidence may not be considered because Porter must, and cannot, satisfy 28 U.S.C. § 2254(e)(2). (*Id.*) Respondents alternatively contend the new exhibits do not establish counsel was ineffective. (*Id.*) Porter contends Ground 1.1(B) "merge[s]" with Ground 4.1, which also alleges IAC for failure to investigate and hire a DNA expert, into one failure to investigate claim. (ECF No. 80 at 10.)

The claim raised in Ground 4.1 was presented during the state postconviction review proceeding. (ECF No. 10-26 at 3.) Postconviction counsel's request for funds to hire a DNA expert to develop the claim was denied. (ECF No. 36-49 at 3.) After the claim was denied, the state appellate court affirmed based on the existing state court record. (ECF No. 10-26 at 3.) Thus, the claim in Ground 4.1 is fully exhausted based on the state court record in existence at that time.

By contrast, Ground 1.1(B), relies upon a DNA expert's report that was not developed as part of the state court record. (ECF Nos. 26-1; 26-2; 26-3; 27 at 31-36.) The Court previously found Ground 1.1(B) is exhausted because the new DNA expert report does not "fundamentally alter" the claim, and deferred ruling on the request to strike the new evidence until the Court's review of the merits of the claim. (ECF Nos. 52 at 3-4; 58 at 3.)

Due to the difference in evidence presented for each claim, the Court separately examines Grounds 1.1(B) and 4.1.

### a.   Additional Background

At the preliminary hearing, the State's DNA analyst, Beata Vida, testified Porter's DNA profile was consistent with a mixture of DNA found in a sperm fraction on S.D.'s underwear. (ECF No. 34-8 at 4-6.) The State disclosed its intention to call Vida at trial. (ECF Nos. 34-14 at 3; 34-16 at 3.) At calendar call on May 19, 2016, both parties announced they were ready for trial and defense counsel stated he received the State's DNA reports. (ECF No. 34-18 at 3-8.) On the morning of the first day of trial, defense counsel informed the trial court that Porter had asked him to request a trial continuance because Porter "needs additional time to prepare questions in reference to the DNA, in reference to just his whole case in general." (ECF No. 34-20 at 7.) Porter informed the trial court that he and defense counsel discussed hiring a defense expert to test and challenge the DNA evidence, but counsel informed him a couple of days prior that he did not do so. (*Id.* at 7-8.) Defense counsel stated he went through the DNA reports, didn't see any discrepancies, and counsel was ready for trial. (*Id.*)

Vida testified, among other things, that a swab from S.D.'s underwear tested positive for semen and sperm, and Vida concluded Porter and Mendoza could not be excluded as possible contributors to the major mixture DNA profile found there:

> [THE WITNESS]: I obtained a mixture of at least three people with at least one being male, and as I mentioned before, sometimes we have mixtures where I'm able to pull out somebody that contributed more DNA versus another person. So in this case I was able to pull out two people that contributed more DNA than the third person. So I made the comparison to the mixture of those two people and compared the buccal swabs that I obtained prior to the mixture that I obtained from that.
>
> Q: And what were your results?
>
> [THE WITNESS]: Daniel Porter and Gregorio Mendoza Perez could not be excluded as possible contributors to the major mixture DNA profile obtained.
>
> Q: And what was the statistic associated with that?
> [THE WITNESS]: And the probability of randomly selecting an unrelated individual from the general population who could be included in the mixture—the major mixture was approximately one in 885 million.

Q: So Daniel Porter's DNA is present and included in that statistic?

[THE WITNESS]: His DNA profile is included in the mixture, yes.

(ECF No. 35-5 at 141-42.) Vida testified that her DNA results were independently reviewed by two scientists for technical and administrative accuracy. (*Id.* at 123.) On cross-examination, defense counsel elicited that Porter's "DNA profile was not found" on the vaginal, cervical, and rectal, right thigh, or right buttock, swabs, or on S.D.'s t-shirt. (*Id.* at 149-52.) Regarding the swab from S.D.'s underwear, Vida again testified she "was able to pull out a major, so a mixture of two people, and the DNA profile from Mr. Porter was included in that mixture." (*Id.* at 151.)

A juror later asked, "Would you confirm . . . was the defendant's DNA found in or on the victim's underwear?" (*Id.* at 153.) Vida responded:

THE WITNESS: Yes, I can say that the DNA profile I obtained off of the underwear, the DNA profile of Daniel Porter could be included in the mixture that was obtained from the underwear.

THE COURT: Okay. And then the juror asks you if you could explain how you came to that conclusion in more detail.

THE WITNESS: Yes. So basically once a DNA profile is obtained, as I mentioned before, it looks like peaks on a graph. I look at those peaks and take whoever's reference standard that I have. I have their DNA profile, and then I see if their DNA profile matches or could be included in the mixture that I obtained. So it's just a very basic comparison of the numbers.

The DNA profile as I mentioned before is a string of numbers. So it's just comparing the numbers to see if that DNA profile fits into that mixture or not. So that's what I did. I just visually looked at it, and if it was included, I did the statistical calculation on it, and people can be included or excluded from that mixture, and in this case Daniel Porter and another individual which was Alberto Gonzalez Orosco were both included in that mixture.

(*Id.* at 153-54.) On re-direct, Vida corrected that Mendoza, not Alberto Gonzalez Orosco, was the other individual to contribute to the mixture of DNA found on the underwear. (*Id.*) The State asked Vida to explain whether she could ever say an individual's DNA is present:

Q. Okay. As a DNA analyst testifying in court, can you ever in any case say that individual's DNA is there? Is that a good question for you? Do you understand what I'm saying? Can you ever say identity assumed?

THE WITNESS: We no longer say that, but we rely on the statistics to tell us whether it's possible or not possible for the DNA profile to match or not.

15

So if I'm saying the probability of a DNA profile coming from a person is 1 to 10, that's not very strong, but if I'm talking about one in billions, quadrillions and bigger than the world's population, although we can't say it, it is indicating that it would be very hard to find a DNA profile to come from somebody else.

Q: And so in this probability that you're saying, can you read it again for me, one in 885 million; is that what it was?

[THE WITNESS]: Yes, one in 885 million.

Q: Okay. So and the population of earth is seven-point-what billion?

[THE WITNESS]: Yes, 7.5 billion.

Q: Okay. So the statistical probability of finding someone's DNA in her underwear would be, like Mr. Porter's, would be one in 885 million people?

[THE WITNESS]: Yes, and the reason it's different because for single-source samples we have all the information. It's easier to say that DNA profile matches. The two DNA profiles match. So we have higher statistical calculations, but in mixtures it's a mixture of two individuals. So we can't really say anything other than whether a DNA profile is included in that mixture or not.

. . . .

Q: So in this case the statistic is that Mr. Porter's DNA was included, and the statistical probability is one in 885 million people?

[THE WITNESS]: Correct.

(*Id.* at 155-56.)

The State argued in closing:

And then DNA, DNA is confusing, and it's hard when all that scientific explanation is given, but the fact of the matter is at the end of the day Daniel Porter's sperm is in her underwear. The probability of that is one in 885 million. So I want you to think of a huge jar that has 885 million pennies and the probability of picking that one little Daniel Porter penny, what are your chances of that, of reaching into that jar and getting Daniel Porter? One in 885 million, Daniel Porter's sperm is in her underwear.

We discussed a little bit earlier about the DNA and the analysts talked to you about it would be hard to find DNA inside the vagina because, A, he didn't ejaculate, and B, she was bleeding. Because she was bleeding her DNA masked that; however, what they did talk to you about is that when someone is bleeding it can often push out what was in the vagina and push it out into the underwear which is exactly what we have here. When she was menstruating, she pushed what was in her vagina out, and that's where you found the defendant's sperm. The DNA was from a sperm fraction in her DNA with a one in 885 million. That's the evidence that he sexually assaulted her vaginally with his penis.

16

(ECF No. 36-4 at 60, 72.) Defense counsel argued in closing that there was no sperm or semen found in the vagina, therefore no penile sexual assault took place. (*Id.* at 78.) Counsel argued there was "no epithelia, the skin DNA found anywhere"—not in her underwear, shorts, or shirt. (*Id.*)

During the state postconviction proceedings, postconviction counsel, sought "additional time to complete an investigation into the forensic evidence utilized by the State" at trial. (ECF No. 36-47 at 3.) At a subsequent hearing, postconviction counsel asked for an extension of time because the "last item on my to do list is looking at the forensic evidence in the case" "[a]nd getting an expert appointed to take a look at everything that was collected, preserved, to determine whether there's any discrepancies that should have been raised at trial." (ECF No. 36-48 at 3.) The state court scheduled a hearing "to see whether or not an expert will be appointed for post-conviction purposes . . .." (*Id.* at 3-4.) The state court denied expert fees because postconviction counsel did not make a "really compelling showing of why" an expert was needed. (ECF No. 36-49 at 3.) The court invited counsel to "supplement" the request, but counsel did not. (*Id.*)

Postconviction counsel also requested an evidentiary hearing to develop a claim that trial counsel was ineffective for failing to hire a DNA expert as raised in the supplemental petition. (ECF No. 36-51 at 3.) Counsel argued, because trial counsel claimed he saw no discrepancies in the DNA reports, it was necessary to hold a hearing to question whether counsel was qualified to make that assessment and reasonably forego an expert's opinion. (*Id.* at 3-8.) The state court saw no grounds to warrant a hearing because "there's been no independent analysis show[ing] that DNA conclusions were wrong or there [sic] even a hint of it." (*Id.* at 7.) Postconviction counsel pointed out that funds were requested for an expert, but the state court denied them because there was insufficient justification. (*Id.*) The state court stood by its conclusion that there were no grounds warranting an evidentiary hearing on the claim. (*Id.* at 7-8.)

### b.    Consideration of New Evidence

In support of Ground 1.1(B), Porter submits an August 24, 2022, Forensic Case Report from Intermountain Forensic, and accompanying curriculum vitae for Sara E. Walker, DNA Technical Leader, and Derek J. Cutler, DNA Analyst. (ECF Nos. 26-1; 26-2; 26-3.) None of these documents were developed as part of the state court record or considered by the state courts in ruling on this claim as alleged in Ground 4.1. The Court concludes it may consider Porter's new evidence because Porter's postconviction counsel made a reasonable attempt, considering the information available at the time, to diligently develop the state court record to include a DNA expert report. Therefore, Porter did not "fail" to develop the state court record within the meaning of 28 U.S.C. § 2254(e)(2). *See Williams*, 529 U.S. at 432, 435. Accordingly, this Court considers the Intermountain Forensic report in its determination whether counsel was ineffective for failing to hire a DNA expert to investigate the DNA.

### c.    Analysis of Ground 1.1(B)

Porter claims the failure to hire a DNA expert allowed the State's DNA analyst to testify that her conclusion that Porter could not be excluded as a contributor to the DNA found on S.D.'s underwear, "meant Porter's DNA was present in her underwear." (ECF No. 27 at 30-36.) The State's expert, however, clarified on redirect examination in response to the juror's request for clarification that she could not really say anything other than whether a DNA profile is included in that mixture or not, and that in her opinion, Porter's DNA was included in the major mixture, as was Mendoza's, on the underwear.

The Court concludes Porter's new evidence fails to establish trial counsel's performance was prejudicial. The Intermountain Forensics Case Report aligns with Vida's testimony, including her determinations that Porter's DNA could not be confirmed in any of the DNA profiles she examined except for the underwear sperm fraction, which yielded the results Vida testified to at trial, i.e., that Porter cannot be excluded as a possible contributor to the major mixture, and the probability statistic is 1 in 885 million. (ECF No. 26-1 at 4.)

18

Porter argues Intermountain's "resolved major mixture" chart analyzed the DNA alleles at several locations from which a resolved major mixture was created. (ECF No. 80 at 27-31.) He claims the alleles establish the DNA mixture could have come from S.D., Mendoza, Gonzalez, or Porter. (*Id.*) He concludes Porter's DNA could not be excluded, but that doesn't necessarily mean Porter was the source of the DNA. (*Id.*) He contends Porter could not be ruled out, but, contrary to Vida's testimony, the allele chart shows Porter could not be "ruled in," and Vida's testimony did not distinguish "could not be excluded" from "match." (ECF No. 27 at 31.) Porter's argument was essentially presented to the jury through the juror's request for clarification and the follow up redirect examination where Vida explained the difference between certainty of the DNA contributor's identity, assuming the identity (which is no longer favored), and use of probability analysis for her conclusions.

Porter argues Vida did not explain why, if it is harder to obtain DNA from a vaginal swab during menstruation, Mendoza's DNA was found, but not Porter's. (ECF No. 27 at 31.) Porter's expert report does not address that argument. As Vida testified, she found on the vaginal swabs a sperm fraction containing an indistinguishable DNA mixture of two individuals, including "at least one" male, and Mendoza could not be excluded as a partial contributor to the mixture. (*Id.* at 134-36.) Her testimony does not rule out Porter as the DNA mixture contained an indistinguishable mixture of two individuals, and she merely lacked sufficient information about the second individual.

Porter's argument that a defense DNA expert would have changed the outcome falls short. Moreover, his supposition that the DNA evidence was all that linked Porter to the assault is simply infirmed. In addition to the DNA evidence, S.D. identified Porter as her assailant, her description of the assailant's vehicle matched Porter's vehicle, the police found the property that her assailant stole from S.D. inside Porter's residence, and Porter's girlfriend testified Porter came home late one night with S.D.'s stolen property. Thus, even assuming arguendo, trial counsel performed deficiently in failing to obtain a DNA expert's opinion before concluding the State's DNA reports held no discrepancies,

Porter fails to establish a reasonable probability the result of the trial would have been different but for counsel's failure to hire a DNA expert. Ground 1.1(B) is therefore denied.

### B.    Ground 1.2(A)—IAC—Failure to Cross-Examine S.D.

Porter alleges trial counsel provided ineffective assistance by failing to cross-examine S.D. about differences between (1) her initial statement to police and her trial testimony, (2) her initial statement to police and trial evidence, and (3) her trial testimony and other evidence, arguing such cross-examination would undermine S.D.'s credibility. (ECF No. 27 at 36-41.) Respondents contend this claim is procedurally defaulted, Porter cannot overcome the default under *Martinez*, and the claim lacks merit. (ECF No. 73 at 14-20.) Porter alleges he can overcome the procedural default. (ECF No. 80 at 32-39.) For the reasons explained below, the Court finds, whether analyzed individually or collectively, the claims are insubstantial. Accordingly, Ground 1.2(A) is dismissed as procedurally defaulted. *See Martinez*, 566 U.S. at 14.

### 1.    Ground 1.2(A)(1)—Initial Statement and Testimony

Porter alleges counsel was ineffective for failing to cross-examine S.D. about the following alleged discrepancies between her statements to the responding officers shortly after the assault and her testimony at trial: (a) she told police the assailant wore a black t-shirt over his head that concealed his nose and mouth but testified he wore a mustache; (b) she told police the assailant threatened to shoot her if she did not give him all her money but did not so testify at trial; and (c) she told police the assailant's vehicle was a dark two-door Honda vehicle, but testified it was an older model Honda Civic. (ECF No. 80 at 34-39 (referring to ECF No. 34-10)). All fairminded jurists would agree Porter has not established a substantial claim that trial counsel's performance was deficient in failing to cross-examine S.D. about these differences.

First, a reasonable attorney could conclude it was futile to cross-examine S.D. about the differences because S.D. could say that the differences in her statements were because she was emotionally overwhelmed when she first spoke with police. The responding officer testified he found S.D. crying "pretty hysterically," and called

paramedics because S.D. was hyperventilating. The officer's body camera recorded their entire conversation, the recording was admitted into evidence, and a portion of it was played for the jury. (ECF No. 35-2 at 114-15.)  Additionally, the officer testified he had never before, or since, "seen someone that traumatized when asked to recall something that happened to them," and "any time she was asked to recall it her emotions took over again," and "she was hysterical and crying and overcome with horror, I guess, fear." (*Id.* at 117-18.) Second, an objectively reasonable attorney could choose not to focus on S.D.'s failure to initially tell police that Porter threatened to shoot her if she did not hand over all her money. S.D.'s testimony that Porter pointed the gun at her, without testifying he made the threat, was arguably more favorable to the defense and asking her about it would give her the opportunity to correct her testimony. Moreover, counsel could conclude that asking whether he threatened to kill her while pointing the gun at her, would focus the jury on Porter's use of the weapon, and did not assist the defense. Third, an objectively reasonable attorney could choose not to cross-examine S.D. about her initial statement that her assailant entered "a dark colored Honda two-door vehicle," because S.D.'s testimony was more favorable to the defense: she testified she did not get a good look at the vehicle, saw it "from a distance," and it "looked like" a dark colored older two-door Honda. Whether analyzed individually or collectively, Porter fails to establish a substantial claim that trial counsel performed deficiently. *See Martinez*, 566 U.S. at 14.

### 2.    Ground 1.2(A)(2)—Omissions from Initial Statement

Porter alleges trial counsel was ineffective for failing to cross-examine S.D. about the following omissions in her statements to the responding officers: (a) the assailant threatened to kill her and passing neighborhood kids; (b) the assailant touched her breasts while holding the gun; and (c) she asked the assailant not to touch her, but he put his hand in her underwear and asked, "Would you rather get killed or dicked down?" (ECF No. 80 at 34-39 (referring to ECF No. 34-10)). All fairminded jurists would agree Porter has not established a substantial claim that trial counsel's performance was deficient in failing to cross-examine S.D. about these omissions.

21

First, an objectively reasonable attorney could conclude cross-examination would lead to credible explanations that the omissions were caused by S.D.'s overwhelming emotional state at the time of her initial encounter with the responding officers. Second, an objectively reasonable attorney could choose not to cross-examine S.D. about the threat to kill the passing teenagers because it was not favorable to the defense or material to the charges. Third, an objectively reasonable attorney could choose not to focus on whether Porter touched S.D.'s breast while holding the gun because Porter was not charged with touching her breast and the battery charge was based on his hitting her in the head. Finally, an objectively reasonable attorney could choose not to focus on whether Porter asked, "Would you rather get killed or dicked down?" because focusing on that detail did not favor the defense. All fairminded jurists would agree, these areas of potential cross-examination, individually or collectively, fail to establish a substantial claim that trial counsel performed deficiently. *See Martinez*, 566 U.S. at 14.

### 3.      Ground 1.2(A)(3)—Initial Statement and Trial Evidence

Porter alleges counsel was ineffective for failing to cross-examine S.D. about the following alleged discrepancies between her initial statement to the responding officers and the trial evidence: (a) she did not tell police her assailant called her names, slapped her on the buttocks, penetrated her anus with his penis, attempted to do so a second time, or hit her in the head with the firearm; (b) she told police the assailant slapped her in the face with an open hand and at trial instead said he hit her in the head with a firearm; but her photograph, taken at the hospital hours later, showed no injury or bruise to her head or face; (c) S.D.'s testimony about the assailant's tattoos do not match Porter's tattoos; and (d) she told police the assailant ejaculated in his hand and "wiped his hand on her shirt near her chest"; but the DNA on her shirt matched Mendoza, not Porter. (ECF No. 80 at 34-39 (referring to ECF No. 34-10)). As explained below, Porter fails to establish a substantial claim that trial counsel was ineffective, and the claim(s) must be dismissed as procedurally defaulted. *See Martinez*, 566 U.S. at 14.

First, there is no substantial claim that trial counsel performed deficiently by failing to cross-examine S.D. about her failure to initially tell police her assailant anally penetrated her twice. An objectively reasonable attorney could conclude that confronting S.D. directly with the omission would have yielded little for the defense given S.D.'s emotional state when she spoke with the responding officers. S.D. told the nurse that she was penetrated anally, and S.D. and the SANE nurse testified S.D. experienced anal pain, and the nurse found lacerations on S.D.'s anus. Moreover, trial counsel chose a reasonable tactic: he elicited from the lead detective that Porter was arrested for only vaginal and finger penetration of the vagina and in closing, argued Porter was not arrested for anal sexual assault, and it was not until later that S.D.'s "story develops into this anal sexual assault," and "someone would not remember getting sexually assaulted in the anus more at a later date than closer in proximity to when it actually occurred." (ECF Nos. 35-5 at 117; 36-4 at 78-79.) Counsel also urged the jury to look at the photograph of S.D.'s anus and argued, "there's nothing there." (ECF No. 36-4 at 79.) There is no indication that cross-examination of S.D. would have contradicted the photographs or nurse's testimony.

Second, there is no substantial claim that trial counsel was ineffective for failing to cross-examine S.D. about her failure to initially inform police she was hit in the head with a gun. At trial, S.D. claimed her assailant either hit her with the gun or "pushed" the gun against her head. An objectively reasonable trial attorney could conclude there was little to gain from pointing out this omission from her statement to the responding officer who described her as "hysterical." Moreover, defense counsel chose a reasonable tactic: He elicited from S.D. that she did not actually see the gun hit her head. (ECF No. 35-2 at 91-92.) Trial counsel also attempted to cross-examine S.D. about her failure to mention in her written statement to police anything about being hit with a firearm, but S.D. responded, "I don't think I got to that. I wasn't able to finish that." (*Id.* at 95-96.) Trial counsel also attempted to cross-examine S.D. about her failure to mention getting pistol-whipped in her right temple during her recorded statement to the police, and she responded, "I think

I did . . . if I remember it, I think I did say something to the detective while he recorded." (*Id.* at 96-97.) In closing remarks, counsel argued "she said that she gets hit, yet at the same time she doesn't know what she gets hit with because she didn't even see it. There's a lot of different testimony as to when—if there was, in fact, a gun when the gun was in fact used, where it was, et cetera." (ECF No. 36-4 at 80.)

Third, Porter fails to establish a substantial claim that trial counsel was ineffective for failing to elicit from S.D. that she did not initially tell police her assailant called her names and slapped her on the buttocks. An objectively reasonable attorney could choose not to question S.D. about this testimony because it was not probative of the charges and focusing on the testimony did not favor the defense.

Fourth, Porter fails to establish a substantial claim that trial counsel was ineffective for failing to cross-examine S.D. about whether the assailant's tattoos match Porter's tattoos. S.D. testified the assailant had a tattoo under his wristwatch. A photograph of Porter's tattoos was entered into evidence a couple of days after S.D. testified at trial. (ECF No. 36-4 at 45.) Under the circumstances, an objectively reasonable attorney could choose to let the jury decide whether the tattoos match S.D.'s testimony.

Finally, Porter alleges trial counsel was ineffective in failing to cross-examine S.D. about her initial statement to the police that Porter ejaculated in his hand and wiped his hand on her shirt. As explained above, the responding officer's body camera recorded the entire conversation he had with S.D., and the body camera recording of the conversation was admitted into evidence at trial. Thus, it appears S.D.'s prior statement that Porter wiped his ejaculate on her shirt was presented to the jury through the admission of the body camera recording. (*Id.*) The DNA Analyst testified on cross-examination that semen was found on S.D.'s shirt, but it did not contain Porter's DNA. (ECF No. 35-5 at 151-52.). In closing remarks, counsel argued there was no DNA on S.D.'s shirt. (ECF No. 36-4 at 78). That was an objectively reasonable tactic under the circumstances. Porter has not established a substantial claim of deficient performance.

### 4.      Summary of Conclusions for Ground 1.2(A)

Porter has not established substantial claims of deficient performance under *Strickland*. Additionally, all fairminded jurists would agree that, even if the failure to conduct cross-examination alleged in Grounds 1.2(A)(1)-(3), individually or collectively, undermined S.D.'s credibility, Porter fails to present a substantial claim of *Strickland* prejudice. Objective evidence supported her story, including that her stolen property was found in Porter's residence, her description of the assailant's vehicle matched Porter's vehicle, her statements to the SANE nurse, the responding officer's recording of S.D.'s state of mind shortly after the incident, and the DNA evidence corroborating the identification of Porter as the perpetrator. Ground 1.2(A) is dismissed as procedurally defaulted.

### C.      Ground 1.2(B)—IAC—Failure to Cross-examine DNA Analyst

Porter alleges trial counsel provided ineffective assistance by failing to, based on the information available to counsel at the time, cross-examine DNA analyst Vida, how if S.D.'s menstrual blood diluted the sample, she was able to gather sufficient DNA that she could not rule out Mendoza as a contributor to the sperm fraction found on S.D.'s vaginal swabs. (ECF No. 27 at 41-43.) Porter claims that, if he assaulted S.D. after she had sex with her husband, his sperm or semen would also be present. (*Id.*) He claims trial counsel never conducted this cross-examination or argued it to refute the State's claim that the menstruation dilution resolved the question why Porter's semen was not found in the vaginal swab. (*Id.*) Respondents contend this claim is procedurally defaulted, Porter cannot overcome the default under *Martinez*, and the claim lacks merit. (ECF No. 73 at 16-20.) Porter alleges the claim is substantial and he can establish counsel was ineffective. (ECF No. 80 at 34, 39-41.)

All fairminded jurists would agree this is not a substantial claim of deficient performance by trial counsel. The State asked Vida, whether it is "difficult to ascertain another individual's DNA within the vagina" if the female is menstruating. (ECF No. 35-5 at 125.) Vida responded "Yes, because it would be diluted and also because of the

menstruation blood would be expelled. So whatever foreign DNA would be on there would be expelled also." (*Id.*) Consistent with that testimony, Vida found sperm and semen on the vaginal swabs and the sperm fraction contained an indistinguishable DNA mixture of two individuals, including "at least one" male—and S.D.'s husband, Mendoza, could not be excluded as a partial contributor to the mixture. (*Id.* at 134-36.) Porter's claim that, had he assaulted S.D. after she had sex with her husband, his sperm or semen would also be present, is based on a false premise that his sperm or semen was not present. As Vida testified, she found DNA on the vagina swab that contained a sperm fraction which contained at least two contributors. Moreover, there is no evidence whether Porter ejaculated inside or outside S.D.'s vagina. And on S.D.'s underwear—precisely where it might end up if Porter did not fully ejaculate inside and a portion fell just outside S.D.'s vagina or if it expelled due to S.D.'s menstruation—Vida could not rule out either Porter or Mendoza from the major mixture of DNA. Because Vida's testimony was not inconsistent, there is no substantial claim that trial counsel's failure to cross-examine Vida about the alleged inconsistencies constitutes deficient performance. Ground 1.2(B) is dismissed as procedurally defaulted.

### D.    Ground 2—Trial Court's Failure to Grant Trial Continuance

Porter alleges the trial court violated his Due Process by denying his request for a trial continuance so he could engage a DNA expert. (ECF No. 27 at 43-45.) Respondents argue the Nevada Court of Appeals' rejection of this claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair-minded disagreement." (ECF No. 73 at 35-38 (citing *Harrington*, 562 U.S. at 103.).)

#### 1.    Additional Background

At the preliminary hearing, Vida testified Porter's DNA profile was consistent with a mixture of DNA found in a sperm fraction on S.D.'s underwear. (ECF No. 34-8 at 4-6.) At arraignment in the state district court, Porter invoked the 60-day rule and trial was scheduled for April 11, 2026. (ECF No. 34-13 at 3.) On March 11, 2016, the State

disclosed its intention to call Vida at trial. (ECF No. 34-14 at 3.) At calendar call, on April 7, 2016, Porter's counsel requested a trial continuance, but Porter did not wish to waive his speedy trial rights, so trial was set for the earliest possible date: May 23, 2016. (ECF No. 34-15 at 4-7.) On April 19, 2016, the State again noticed it would call Vida at trial. (ECF No. 34-16 at 3.) At calendar call on May 19, 2016, the parties were ready for trial. (ECF No. 34-18 at 3.) At that hearing, Porter asked the trial judge to direct defense counsel to give him the DNA report. (*Id.* at 5-8.) Although defense counsel assured the trial court that Porter had received the DNA reports, the trial court directed defense counsel to again provide them to Porter. (*Id.*)

On the morning of trial, defense counsel informed the trial court that Porter had asked him to request a trial continuance because Porter "needs additional time to prepare questions in reference to the DNA, in reference to just his whole case in general." (ECF No. 34-20 at 7.) The State opposed arguing Porter was present during the DNA expert's testimony at the preliminary hearing, the DNA reports were in discovery, Porter had plenty of time to prepare his questions for his attorney, and defense counsel stated he's ready for trial. (*Id.*) Porter informed the trial court he and defense counsel discussed hiring an expert to test and challenge the DNA evidence, but Porter learned a couple of days prior that counsel did not do so. (*Id.* at 7-8.) Defense counsel explained that he didn't see any discrepancies. (*Id.*) The request for continuance was denied as untimely. (*Id.*)

### 2. Applicable Legal Principles

"The denial of a request for a continuance may, under unusual circumstances, result in a denial of due process." *Michaels v. Davis*, 51 F.4th 904, 943 (9th Cir. 2022) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Trial courts "necessarily require a great deal of latitude in scheduling trials." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). "[B]road discretion must be granted trial courts on matters of continuances[.]" *Id.* Only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay" does a Due Process violation occur. *Id.* at 11-12 (citing *Ungar,* 376 U.S. at 589). If a due process violation occurred, it does not justify

habeas relief, unless it had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### 3.    Analysis of Ground 2

On direct appeal, the Nevada Court of Appeals (NCA) held the trial court did not abuse its discretion because Porter did not present compelling reasons for continuance:

> The district court did not abuse its discretion by denying Porter's motion to continue trial made on the morning of trial as Porter announced ready for trial at calendar call. Further, Porter failed to present any other compelling reasons for a continuance. *See Rose*, 123 Nev. at 206, 163 P.3d at 416 (footnote omitted) ("This court reviews the district court's decision regarding a motion for continuance for an abuse of discretion.").

*Porter v. State*, No. 70663, 2017 WL 1806817, at *2 (Nev. App. Apr. 28, 2017).

The NCA's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). Porter and his counsel were aware early on—and more than once—that the State would call a DNA expert. Porter and his counsel received the State's DNA expert reports and discussed obtaining an expert before trial. Against Porter's wishes, defense counsel opted not to hire a DNA expert. At calendar call and on the first day of trial, defense counsel announced he was ready for trial. Porter has not established that, based on the record before the trial court, the trial court's conclusion that the request for continuance was untimely was an unreasoned and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. Thus, it was not objectively unreasonable to conclude that Porter fails to establish a Due Process violation. Moreover, even assuming he did, it is not objectively reasonable to conclude that he cannot establish that the denial of continuance so he could hire a DNA expert to test and challenge the State's DNA evidence, had a substantial and injurious effect or influence in determining the jury's verdict. Ground 2 is denied.

### E.   Ground 3—Sufficiency of the Evidence

Porter alleges the evidence was insufficient to support the convictions in violation of Due Process. (ECF No. 27 at 45-47.)

#### 1.   Applicable Legal Principles

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support a conviction. *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). A jury's verdict "must stand if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).

Generally, the credibility of witnesses is beyond the scope of a review of the sufficiency of the evidence. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The *Jackson* standard applies "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

In a sexual assault case in Nevada, "[t]he victim's testimony alone is sufficient to uphold a conviction." *Rose v. State*, 163 P.3d 408, 414 (Nev. 2007). A Nevada jury may also "reasonably rely upon circumstantial evidence" in reaching a verdict. *Wilkins v. State*, 609 P.2d 309, 313 (Nev. 1980); *see also Jackson*, 443 U.S. at 324-26 (finding circumstantial evidence sufficient to prove specific intent to kill); *Holland v. United States*, 348 U.S. 121, 139-40 (1954) (rejecting that circumstantial evidence must prove every hypothesis but guilt).

**2.    Analysis of Ground 3[4]**

On direct appeal, the NCA determined a reasonable jury could find the State proved each element of the offenses beyond a reasonable doubt:

> Evidence is sufficient to support a verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Higgs v. State*, 126 Nev. 1, 11, 222 P.3d 648, 654 (2010) (quoting *Rose v. State*, 123 Nev. 194, 202, 163 P.3d 408, 414 (2007) (internal quotations omitted)). Here, our review of the record reveals that a reasonable jury could find the State proved each element of sexual assault with use of a deadly weapon, kidnapping with use of a deadly weapon, and battery with intent to commit sexual assault with use of a deadly weapon beyond a reasonable doubt. *See* NRS 193.165; NRS 200.310; NRS 200.364; NRS 200.366; NRS 200.481.
>
> The victim testified at trial that Porter, a stranger, accosted her as she sat in her vehicle, pointed a gun at her, forced her to drive to a secluded area, sexually assaulted her, and hit her with the firearm. A victim's testimony alone is sufficient to uphold a conviction. *Rose*, 123 Nev. at 203, 163 P.3d at 414. Though Porter argues the victim is not a credible witness, "[i]t is the jury's function, not that of the court, to assess the weight of the evidence and determine the credibility of the witness." *Id.* at 202-03, 163 []P.3d at 414 (internal quotations omitted). Furthermore, DNA evidence conclusively corroborated the identification of Porter as the perpetrator.

*Porter v. State*, No. 70663, 2017 WL 1806817, at *1 (Nev. App. Apr. 28, 2017). The NCA's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

**a.    Sexual Assault**

A person is guilty of sexual assault if he "[s]ubjects another person to sexual penetration . . . against the will of the victim or under conditions in which the perpetrator

---

[4]Porter does not contend the State presented insufficient evidence to support the crime of robbery with use of a deadly weapon, or the enhancement for use of a deadly weapon as applied to the convictions for sexual assault with use of a deadly weapon, battery with the intent to commit sexual assault with use of a deadly weapon, and first-degree kidnapping with use of a deadly weapon. (ECF Nos. 27 at 45-47; 80 at 60-62.)

knows or should know that the victim is mentally or physically incapable of resisting . . .." NRS § 200.366(1)(a), *as amended by* Laws 2007, c. 528, § 7, eff. Oct. 1, 2007.

A victim's testimony alone is sufficient to uphold a conviction. *See Rose*, 163 P.3d at 414. In addition to S.D.'s testimony that Porter penetrated her vaginally with his fingers and penis, and anally penetrated her, against her will at gunpoint, her testimony was corroborated by her recorded statement to the responding officer, the SANE nurse's testimony that S.D. told her she had been vaginally and anally assaulted, the nurse's testimony that she found lacerations on S.D.'s anus, the property stolen from S.D. during the sexual assaults was found at Porter's residence, her description of the assailant's vehicle that matched Porter's, and the DNA Analyst could not exclude Porter's DNA profile from a sperm fraction found in S.D.'s underwear. Under the circumstances, the NCA's application of *Jackson* is objectively reasonable.

### b.    Battery with Intent to Commit Sexual Assault

Porter was charged with "willfully, unlawfully, and feloniously" using "force or violence upon . . . S.D., with intent to commit sexual assault, by hitting the said S.D. in the head, with the use of a deadly weapon, to-wit: a handgun." (ECF No. 36-2 at 5.) "Battery" means any willful and unlawful use of force or violence upon the person of another. NRS § 200.400(1)(a), *as amended by* Laws 2009, c. 42, § 2, eff. May 6, 2009.

S.D. testified Porter either hit her in the head with the gun or pushed the gun against her head during the sexual assault. Although the SANE nurse found no bruises anywhere on S.D. except her thigh and no lacerations other than on her anus, and the hospital photograph of S.D. may not have shown evidence that Porter battered S.D. with intent to commit sexual assault, a victim's testimony alone is sufficient to uphold a conviction. *See Rose*, 163 P.3d at 414. The NCA was objectively reasonable in its application of *Jackson*.

### c.    First-Degree Kidnapping

NRS § 200.310(1) provides the requirements to establish first-degree kidnapping:

A person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever with

the intent to hold or detain, or who holds or detains, the person . . . . for the purpose of committing sexual assault, extortion or robbery upon or from the person . . . is guilty of kidnapping in the first degree . . . .

"[M]ovement or restraint incidental to an underlying offense where restraint or movement is inherent, as a general matter, will not expose the defendant to dual criminal liability under either the first- or second-degree- kidnapping statutes." *Mendoza v. State*, 130 P.3d at 180-81 (Nev. 2006). To sustain both a kidnapping conviction and a robbery and/or sexual assault conviction based on the same incident, "any movement or restraint must stand alone with independent significance from the act of robbery [and/or sexual assault] itself, create a risk of danger to the victim substantially exceeding that necessarily present in the crime of robbery [and/or sexual assault], or involve movement, seizure or restraint substantially in excess of that necessary to its completion." *See id.* Whether the movement of the victim was incidental to the robbery and/or sexual assault is a question of fact for "the jury in all but the clearest cases." *Langford v. State*, 600 P.2d 231, 236-37 (Nev. 1979).

S.D. testified Porter continuously held her at gunpoint, found her ATM card, and directed her to drive to the bank so they could see if she had any money, but that after she drove a short distance, he directed her to pull over where he searched for money in her breast area, vagina, and under the car seat, and finding none, battered her with the gun and sexually assaulted her, before directing her at gunpoint to return to her residence where he stole her purse, camera, other items, and stole speakers from the trunk of her car. Based on these facts, a rational trier of fact could determine that Porter held or detained S.D. for the purpose of committing sexual assault and/or robbery.[5] *See Rose*,

---

[5]At the relevant time, Nevada's robbery statute provided:

Robbery is the unlawful taking of personal property from the person of another, or in the person's presence, against his or her will, by means of force or violence or fear of injury, immediate or future, to his or her person or property, or the person or property of a member of his or her family, or of anyone in his or her company at the time of the robbery. A taking is by means of force or fear if force or fear is used to:

(a) Obtain or retain possession of the property;

163 P.3d at 414. A rational juror could moreover conclude the movement of S.D. was not merely incidental to the commission of robbery or sexual assault. Although Porter could have robbed or sexually assaulted S.D. in the car in front of her house, Porter became aware that S.D. lived in the house with her husband, mother, and son, and her mother and son were at home at the time. A rational juror could conclude the movement had independent significance from the act of robbery and sexual assault. Although Porter could have, and eventually did, steal the ATM card and other items from S.D. in front of her house, a rational juror could conclude the interlude where he directed her to drive toward the bank so they could see if she had any money, had independent significance from the acts of robbery and sexual assault, as it created a risk of danger to S.D. that substantially exceeded that necessarily present in the crime of robbery and sexual assault, and involved movement, seizure or restraint substantially in excess of that necessary to completion of the robbery and sexual assault. Accordingly, the NCA was objectively reasonable in its application of *Jackson* to the first-degree kidnapping conviction.

For the reasons explained above, Ground 3 is denied.

### F.   Ground 4.1—IAC—Failure to Investigate DNA and Hire DNA Expert

As discussed in Ground 1.1(B), Porter alleges in Ground 4.1, that, based on the evidence in the state court record, trial counsel provided ineffective assistance by failing to investigate, verify, and hire a DNA analyst to challenge, the results of the DNA evidence. (ECF No. 27 at 48-56.)

---

(b) Prevent or overcome resistance to the taking; or
(c) Facilitate escape.

The degree of force used is immaterial if it is used to compel acquiescence to the taking of or escaping with the property. A taking constitutes robbery whenever it appears that, although the taking was fully completed without the knowledge of the person from whom taken, such knowledge was prevented by the use of force or fear.

NRS § 200.380(1), *as enacted by* Laws 1995, p. 1187.

Applying *Strickland*, the Nevada Supreme Court (NSC) determined Porter did not establish counsel provided ineffective assistance by failing to investigate and challenge the DNA evidence by retaining a defense expert:

> [P]orter argues that counsel should have further investigated and challenged the DNA evidence by retaining a defense expert. Porter has not demonstrated deficient performance or prejudice. On the first day of trial, Porter stated he and counsel discussed retaining a defense expert to challenge the DNA evidence but counsel stated that he had reviewed the DNA and did not see any discrepancies. Thus, the record shows counsel considered retaining an expert and supports the district court's conclusion that counsel made a strategic decision not to do so. Porter has not demonstrated extraordinary circumstances that undermine counsel's strategic decision. *See Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (explaining that the court is "required not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons [a petitioner's] counsel may have had for proceeding as they did" (internal quotation marks, alterations, and citations omitted)); *Lara v. State*, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) (holding that counsel's strategic decisions are "virtually unchallengeable absent extraordinary circumstances" (internal quotation marks omitted)). Porter does not argue, nor has he alleged sufficient facts to demonstrate, that independent expert testing would have yielded different results. Further, to the extent Porter challenges counsel's alleged failure to investigate the qualifications of the State's expert or the process of the DNA testing, he only claims that errors might have been discovered. *See Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984) (providing that a claim must be supported by specific factual allegations that would entitle the petitioner to relief if true); *see also Evans v. State*, 117 Nev. 609, 645, 28 P.3d 498, 522 (2001) (recognizing that a petitioner alleging ineffective assistance of counsel for failure to procure expert testimony must "allege specifically what the[] expert[] could have done to make a different result reasonably probable"), *overruled on other grounds by Lisle v. State*, 131 Nev. 356, 366 n.5, 351 P.3d 725, 732 n.5 (2015). And Porter has not demonstrated a reasonable probability of a different outcome had trial counsel pursued this line of investigation considering the overwhelming evidence of guilt, including the victim's identification of Porter as her assailant, her description of the assailant's vehicle that matched Porter's, and the recovery of the victim's stolen property from his residence. The district court therefore did not err in denying this claim without an evidentiary hearing.

*Porter v. State*, 498 P.3d 773 (Nev. 2021).

The NSC's determination that Porter failed to establish prejudice under *Strickland* is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented during the state court proceedings. 28 U.S.C. § 2254(d). Considering the record before that court, it was

34

reasonable to conclude Porter did not establish a reasonable probability of a different outcome but for counsel's failure to hire a DNA expert. Even without the State's DNA expert's testimony, there was overwhelming evidence of guilt. In addition to S.D.'s testimony that Porter penetrated her vaginally with his fingers and penis, and anally penetrated her, against her will at gunpoint, her testimony was corroborated by her recorded statement to the responding officer, the SANE nurse's testimony that S.D. told her she had been vaginally and anally assaulted, the nurse's testimony that she found lacerations on S.D.'s anus, Porter's girlfriend testified she saw Porter came home late one night with S.D.'s property, and the property stolen from S.D. during the sexual assaults was found at Porter's residence along with a handgun and Porter's vehicle, which matched S.D.'s description of the assailant's handgun and vehicle. For these reasons, Ground 4.1 is denied.

### G.    Ground 4.2—IAC—Failure to Object to Prosecutorial Misconduct

Porter alleges trial counsel provided ineffective assistance by failing to object to the prosecutor's alleged misconduct in closing remarks. (ECF No. 27 at 56-63.) Respondents contend the NSC was objectively reasonable in its determination that Porter failed to establish counsel was ineffective. (ECF No. 73 at 28-30.)

#### 1.    Applicable Legal Principles

Due Process is violated if a prosecutor's misconduct renders a trial "fundamentally unfair." *See Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Claims of prosecutorial misconduct in closing argument require a reviewing court to first assess whether the prosecutor's remarks were improper. *See United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005); *see also Greer v. Miller*, 483 U.S. 756, 766 (1987) (explaining the analysis must place the remark in context and consider "the entire trial."). In making that determination, a court looks to various factors including, the weight of the evidence, the prominence of the comment in the context of the entire

trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in its summation and whether defense counsel had an adequate opportunity to rebut the comment. *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)); *see also*, *e.g.*, *Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005) (finding remarks not improper under *Darden* as they were based upon "reasonable inferences from the evidence presented"); *Jones v. State*, 937 P.3d 55, 63 (Nev. 1997) (holding prosecutor may "argue inferences from the evidence and offer conclusions on contested issues.").

If a statement is deemed improper, the next question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181 (citation modified). Federal habeas relief is warranted only if the misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-38 (1993).

Trial counsel's failure to object is not ineffective performance where an objection would have lacked merit. *See Flournoy v. Small*, 681 F.3d 1000, 1006 (9th Cir. 2012) ("The failure to make an objection that would have been overruled was not deficient performance."); *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("trial counsel cannot have been ineffective for failing to raise a meritless objection"); *see also Morris v. State of Cal.*, 966 F.2d 448, 456 (9th Cir. 1991) ("[W]e need not determine the actual explanation for trial counsel's failure to object, so long as his failure to do so falls within the range of reasonable representation.").

### 2.    Analysis of Ground 4.2

On postconviction review, the NSC determined there was no prosecutorial misconduct, and therefore, under *Strickland*, neither trial nor appellate counsel were ineffective for failing to challenge the prosecutor's closing remarks:

> Porter argues that trial counsel should have objected to arguments by the prosecutor that misstated the evidence, asked the jury to uphold community standards, and invited the jury to place themselves in the victim's position; additionally, he contends that appellate counsel should have raised this

issue. Porter has not shown deficient performance or prejudice. First, the prosecutor did not misstate the evidence by arguing that medical testimony supported the victim's story. *See Miller v. State*, 121 Nev. 92, 100, 110 P.3d 53, 59 (2005) ("[T]he prosecutor may argue inferences from the evidence and offer conclusions on contested issues." (internal quotation marks omitted)). Next, the prosecutor did not improperly argue the jurors, as members of the community, were obligated to return a guilty verdict; rather, the prosecutor argued that everyone in a civil society needs to be held accountable for their decisions. *Cf. Collier v. State*, 101 Nev. 473, 479, 705 P.2d 1126, 1130 (1985) (disapproving of a prosecutor "blatantly attempt[ing] to inflame a jury by urging that, if they wish to be deemed 'moral' and 'caring,' then they must approach their duties in anger and give the community what it 'needs': '[t]he chance to see that this killer gets what he deserves'"). Last, the prosecutor did not make an improper golden rule argument. Taken in context, the prosecutor discussed the embarrassing aspects of what the victim underwent during the investigation and trial in order to argue that she had no motive to fabricate her story. *Cf. McGuire v. State*, 100 Nev. 153, 157, 677 P.2d 1060, 1064 (1984) (holding that prosecutor's remarks imploring jurors to place themselves in the victim or victim's families' position were improper). Because there was no prosecutorial misconduct, trial and appellate counsel did not have to object or raise the issue on appeal in order to provide effective assistance. *See Ennis v. State*, 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006) ("Trial counsel need not lodge futile objections to avoid ineffective assistance of counsel claims."); *Kirksey*, 112 Nev. at 998, 923 P.2d at 1114 (recognizing that appellate counsel is not ineffective for declining to raise meritless issues). Porter further has not demonstrated a reasonable probability of a different outcome had trial counsel objected to any of these arguments given the overwhelming evidence of guilt discussed above. The district court therefore did not err in denying this claim without an evidentiary hearing.

*Porter v. State*, 498 P.3d 773 (Nev. 2021).

As explained below, the NSC was objectively reasonable in its determinations that trial counsel's performance was neither deficient nor prejudicial because the prosecutor's remarks did not constitute misconduct. Additionally, the NSC's determination that Porter failed to establish prejudice under *Strickland* is objectively reasonable given the strong evidence of guilt. *See* Ground 3.

### a.      Argument that S.D.'s Story was Corroborated

Porter alleges the prosecutor falsely argued, and improperly vouched and bolstered S.D.'s testimony, by arguing: (1) "everything S.D. said happened can be—you can look and see and match that with the findings in the sexual assault nurse examination." (ECF No. 27 at 56-58.) Porter claims this argument mischaracterized the SANE nurse's testimony because the nurse testified, "there were no signs of blunt force

trauma on the external genitalia, and on the vaginal walls or the cervical os of the uterus," and "no abrasion or scruffing" of the posterior fourchette or the fossa navicularis. (*Id.*) The NSC's determination that this was not prosecutorial misconduct, and therefore trial counsel was not ineffective in failing to object, is objectively reasonable. The SANE nurse testified that it was to be expected that there would be no signs of blunt force trauma on the external genitalia, vaginal walls, or cervical os of the uterus because in the "[t]he majority of sexual assaults that occur to a vagina, there are no injuries found, particularly when you have an adult who is . . . sexually active . . . and the fact that Ms. Diaz was on her menstrual cycle and that blood could have been a lubricant." (ECF No. 35-2 at 150-51.) Moreover, S.D. told the nurse she was vaginally and anally assaulted and the nurse found lacerations on S.D.'s anus. The prosecutor was entitled to argue inferences from the evidence. *See Jones*, 937 P.3d at 63. Thus, it was not unreasonable to conclude the prosecutor's remarks did not misstate the evidence, and that trial counsel was not ineffective for failing to object. *See Flournoy*, 681 F.3d 1006.

### b.    Argument to Hold Porter Accountable

Porter argues the prosecutor inflamed the jury in the italicized portion of the following closing argument:

> *What this comes down to at the end of the day is accountability. In order for people like you and me and Daniel Porter and the Judge to live in a society where people are safe in their homes, we all have to be held accountable. That's what I was talking about in the beginning of this, about the decisions we make and the actions we take, okay . . ..*
>
> When Daniel Porter made those decisions, he made them, and too bad, so sad for Daniel Porter because he got caught. He got caught in every way you could get caught, in property, in ID, in DNA, his girlfriend. He got caught so far beyond reasonable doubt it is not even funny.
>
> *You are the only 14 people—soon to be 12 people—that can tell him what he did to her is wrong, that as citizens of our community you don't get to tell a mother that when she doesn't allow you in the house because her 3-year-old son is in there to find you some money, and then when she can't find you some money, you don't get to go rape her while you hold a gun to her.*
>
> The State is asking you to go back there, to go through the instructions, to go through the evidence, to discuss with each other these crimes and to come back in here and look him in the eye and tell him what he did was wrong, that you will not accept it, and the State is asking you to do that by

finding him guilty of the crimes with which we've charged him, and that is our request at this time.

(ECF Nos. 27 at 58-59; 36-4 at 73-74.) Porter contends the above italicized argument urged the jury to inappropriately approach its duties with anger, suggested the jurors were aligned with the prosecution in condemning Porter if they found him guilty, and allowed the jury to convict Porter based on emotion rather than the evidence or lack of evidence. (*Id.*)

It was objectively reasonable to conclude the prosecutor's argument was not misconduct because it was made in the context of urging the jury to "go through the instructions" and "go through the evidence," and find the State proved Porter guilty. Moreover, counsel had the opportunity to refute the argument in the defense closing remarks. The NSC was objectively reasonable in its determination Porter failed to demonstrate counsel was ineffective for failing to object to the remarks.

### c.     Argument that S.D. Lacked Motive to Lie

Porter alleges the prosecutor improperly attempted to invoke sympathy, inflamed the jury, and vouched for S.D., by arguing S.D. lacked a motive to fabricate her story given the humiliation of (1) having to testify in front of complete strangers about being anally raped; (2) having pictures of her vagina and anus shown to the jury; and (3) having to undergo a SANE. (ECF No. 27 at 60-62.) He claims this argument invited the jury to convict Porter because the jury felt bad for what S.D. experienced as a victim. (*Id.*) He claims the State's argument, italicized below, improperly invited the jurors to put themselves in S.D.'s position:

Also consider motive. What motive does this woman have to make this up or to lie about it? She doesn't know him. What beef does she have with Daniel Porter? *What must it be like to come in here in front of all of you, complete strangers and talk about being raped anally, to know that pictures of your vagina and your anus are going to be part of this process. How humiliating must that be. Why would you walk through those doors and do this? Why would you put yourself through a sexual assault nurse examination? You want to know why? Because someone did this to you, and it's time for them to pay the piper, and that's why she did that.*

The law says that there is no requirement that the testimony of a victim of sexual assault be corroborated, and her testimony if believed beyond a

reasonable doubt is sufficient to sustain a verdict of guilty, and what that means is is if you believe what [S.D.] told you when she came in here and took that stand and swore to tell the truth and nothing but the truth so help her God, if you believe the words that came out of her mouth, that is enough. That's enough to sustain a verdict of guilty. It does not have to be corroborated. So I'd submit to you if you believe what she told you, your job is done.

But if that isn't enough for you, and you want to look at the corroboration even though it is not necessary, let's look at the corroboration in this case of things that [S.D.] told you . . ..

(*Id.* at 61; ECF No. 36-4 at 57-58.)

The NSC's determination that the remarks did not constitute prosecutorial misconduct and therefore counsel did not perform deficiently by failing to object is objectively reasonable. The prosecutor discussed the embarrassing aspects of what the victim underwent during the investigation and trial as part of its argument that she had no motive to fabricate her story. The prosecutor was entitled to argue inferences based on the evidence. *See Jones*, 937 P.3d at 63. Moreover, the jury was instructed "A verdict may never be influenced by sympathy, prejudice or public opinion." (ECF No. 36-2 at 28.) *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

### d.    Cumulative Effect of Prosecutor's Remarks

Porter alleges the prosecutor's remarks, considered cumulatively, infected the trial with unfairness as to make his convictions a denial of due process and there was no reasonable strategic reason for counsel's failure to object, and as a result, in each instance, counsel's failure to object was prejudicial. (ECF No. 27 at 62-63.) Porter fails to demonstrate even one instance where counsel was ineffective for failing to object to the prosecutor's closing remarks as prosecutorial misconduct. This claim is denied as there is no error to cumulate.

For the forgoing reasons, Ground 4.2 is denied.

### H.    Ground 4.3—IAC—Failure to Object to CSI Analyst Testimony

Porter alleges trial counsel provided ineffective assistance by failing to object to the senior crime scene analyst's testimony that S.D.'s makeup bag seemed to have been

40

"wiped down," because such testimony "fell outside the knowledge and scope" of the analyst's expertise. (ECF No. 27 at 63-66.)

At trial, the Metro senior crime scene analyst testified that, when collecting evidence in the case, she found no fingerprints on the makeup bag because the powder she placed on it revealed "smudges and smears all over the outside of it." (ECF No. 35-2 at 176-77.) She testified that, based on her experience as a senior crime scene analyst, "[i]t seemed like it had been wiped down." (*Id.*)

Applying *Strickland*, the NSC determined Porter has not shown deficient performance or prejudice:

> [P]orter argues that counsel should have objected to expert testimony regarding the collection of fingerprint evidence that fell outside of the witness's expertise. At trial, a crime scene analyst testified that fingerprints could not be taken from the victim's makeup bag because "[i]t seemed like it had been wiped down." Porter fails to show deficient performance or prejudice. The State noticed the analyst as an expert in the "collection and preservation of evidence." We conclude that the analyst did not exceed the scope of her qualifications when testifying about her observations while processing the crime scene and why she did not collect fingerprints from the makeup bag. Accordingly, an objection by counsel would have been futile. *See* NRS 50.275 (providing the scope of expert testimony); *Ennis*, 122 Nev. at 706, 137 P.3d at 1103 ("Trial counsel need not lodge futile objections to avoid ineffective assistance of counsel claims."). And Porter did not demonstrate that there was a reasonable probability of a different outcome given the overwhelming evidence of guilt and the fact that the jury already heard the victim's testimony that Porter wiped down areas within the vehicle that he touched. The district court therefore did not err in denying this claim without an evidentiary hearing.

*Porter v. State*, 498 P.3d 773 (Nev. 2021).

The NSC's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on unreasonable determinations of fact. 28 U.S.C. § 2254(d). The State noticed the analyst as an expert in the "collection and preservation of evidence." (ECF No. 34-14 at 3; 34-16 at 3.) The analyst did not exceed the scope of her qualifications as an expert on "collection and preservation of evidence" by testifying that, based on her experience as a senior crime scene analyst collecting evidence, it appeared, after she applied fingerprint powder to the makeup bag, that the bag had been wiped due to the

"smudges and smears" she found "all over the outside of it." Moreover, a photograph of the makeup bag (State's Exhibit 26) with the fingerprint powder on it, was admitted into evidence so the jury could decide whether the makeup bag appeared to have been wiped down or not. (ECF No. 35-2 at 169, 176-77.) For the foregoing reasons, Ground 4.3 is denied.

### I.      Ground 5—IAC—Appellate Counsel—Failure to Argue Misconduct

Porter alleges appellate counsel provided ineffective assistance by failing to assert prosecutorial misconduct occurred during closing argument based on the statements alleged in Ground 4.2. (ECF No. 27 at 66-67.) He claims that, although the claim was unpreserved by trial counsel, the misconduct was clear on the face of the record, and appellate counsel was ineffective for failing to raise the claim under plain error review because there is a reasonable probability counsel would have succeeded even under that higher standard of review. (*Id.*)

To prevail on an ineffective assistance of appellate counsel claim, a petitioner must show (1) appellate counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them" and (2) "a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

Applying *Strickland*, the NSC determined Porter has not shown deficient performance or prejudice for his appellate counsel IAC claim as the remarks Porter alleged are not misconduct. *See* Ground 4.2. Given the determinations in Ground 4.2, it was reasonable to conclude Porter failed to establish appellate counsel could have successfully challenged the prosecutor's remarks as misconduct under a plain error standard of review in the state appeal. Ground 5 is denied.

### J.      Ground 7—Cumulative Error

Porter seeks relief based on the cumulative effect of the IAC errors he raised in Grounds 4 and 5. (ECF No. 27 at 68-70.)

Although IAC claims are examined separately to determine whether counsel was deficient, the purpose of the Sixth Amendment's guarantee to counsel is "simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689, 691-92. The Ninth Circuit Court of Appeals has held, "[w]hile an individual claiming IAC must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," the court "considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original) (citation modified); *see also Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("We must analyze each of his claims separately to determine whether his counsel was deficient, but 'prejudice may result from the cumulative impact of multiple deficiencies.'") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)).

During state postconviction review, the NSC held: "Porter argues cumulative error. Even assuming that multiple errors may be cumulated to demonstrate prejudice in a postconviction context, *see McConnell v. State*, 212 P.3d 307, 318 n.17 (Nev. 2009), Porter has not shown any instances of deficient performance to cumulate." *Porter v. State*, 498 P.3d 773 (Nev. 2021). The NSC's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law and is not based on an unreasonable determination of fact. 28 U.S.C. § 2254(d). Porter did not demonstrate in Grounds 4 and 5 that he received constitutionally inadequate assistance of counsel that denied him due process or a fair trial. Accordingly, Ground 7 is denied.[6]

---

[6]Additionally, even considering Porter's procedurally defaulted IAC claims in Ground 1, the Court finds Porter did not, on the whole, receive constitutionally inadequate assistance of counsel that denied him due process or a fair trial.

### K.    Ground 8—Cruel and Unusual Punishment

Porter alleges his sentence of 62[7] years plus almost 1 month-to-life imprisonment for the six crimes of conviction and deadly weapon enhancements, constitute cruel and unusual punishment in violation of the Eighth Amendment because the sentences are grossly disproportionate to the crimes. (ECF No. 27 at 70-71.)

### 1.    Additional Background

According to the Presentence Investigation Report (PSIR), Porter was 28 years old and a "self-admitted" member of the West Coast Bloods gang. (ECF No. 38-1 at 3.) Porter's parole term in another case expired while he was in custody on May 13, 2015—less than a month before the crimes committed against S.D. (*Id.* at 4.) Porter had prior convictions for conspiracy to commit a crime, conspiracy to commit robbery, robbery with a deadly weapon, and grand larceny auto. (*Id.* at 4.) He also had three pending felony cases for charges including robbery with a deadly weapon, owning/possessing a firearm by prohibited person; first-degree kidnapping with a deadly weapon, coercion with force or threat of force with a deadly weapon; and grand larceny auto. (*Id.* at 5.)

At sentencing the State requested the trial court follow the recommendations in the PSIR, i.e., 65 years to life, and run every count consecutive because:

> This is an individual who got off of parole 25 days before this event. He was on parole for a series of robbery convictions, series of robbery with use convictions, which he actually went to trial on in, I believe, 2009.
>
> In this case, [S.D.], she was a mother of one child, drives home, parks right in front of her house, is on a Wi-Fi, turns off the car, turning off the car unlocks the door. Mr. Porter goes to the passenger car side, not knowing [S.D.] puts a gun to her head and tells her to give her "fucking everything."
>
> She doesn't have much; she tries to give him anything she has. She gives him the purse, she gives her phone, gives her everything. That's not enough for Mr. Porter. Mr. Porter wants to go inside the house and take more property.
>
> [S.D.] has her three-year-old son and her mother inside that house. She made a point of saying that she would absolutely not let him into the house. That's not enough for Mr. Porter.

---

[7]Porter alleged his aggregate sentence is 70 years to life. (ECF No. 27 at 70.) As Respondents point out, his aggregate sentence is 62 years and almost one month-to-life imprisonment. (ECF No. 36-10 at 10-12.)

Mr. Porter then, gun to the head, makes [S.D.] drive off into the neighborhood—into a dark spot in the neighborhood in which then he proceeds to anally, vaginally and digitally rape her. If that's not enough, he then puts a gun to her head and makes her drive back.

I would note and, Your Honor, you heard [S.D.]' testimony which I think is pretty emotional about how she basically begged him not to and told him that she would give him anything he wanted as long as he didn't do—that she was—she thought she was pregnant—said that she had a husband. You heard her cry on the stand.

He then proceeds, after raping her and ejaculating, which led—leads to— . . .DNA . . . found in her underwear. He then proceeds to have her drive back to the house and to add insult to injury, makes her pop the trunk of her car and then steal her speakers, and which then we saw that her speakers on Mr. Porter's phone.

You—in this case you don't have to guess how her actions afterwards were. We saw the body-cam video. We saw what happened right afterwards. We saw how distraught [S.D.] is and how distraught that three-year-old was. One of the most powerful images I get from this trial, and I've done a lot of trials, and one that sticks with me is that three-year-old asking his mom what happened, what happened.

I've spent many, many hours with [S.D.], and she is not the perfect victim. She's had her demon, substance-abuse wise, but she was at a house, she was—she had custody of her three-year-old. I will tell you, Your Honor, and Mr. Marchese knows this because we had the preliminary hearing while she was still pregnant, she got pregnant shortly afterwards, and she didn't want to get prenatal care because she was worried that that baby was Mr. Porter's, a product of rape. It was only after our office begged her to go get the care that she eventually did and eventually had that child, a daughter.

I will say that this rape led [S.D.] down a tailspin in which she has now lost custody of her three-year-old. The three-year-old is now in custody of the biological father. She doesn't have custody of the baby because, quite frankly, she got addicted to opiates after this to deal with, you know, the issues that came from this. Her life is -- and then she was basically—by the time we found her at trial, she was basically homeless because of what happened that night.

Mr. Porter has done every type of crime. He's robbed people in the past, he's stolen vehicles, he's stolen property, he's sold drugs, he's a gang member. The marble manor that's tattooed on his arms is the originating place of the West Coast Bloods. He has done everything, every type of criminal act. He doesn't deserve anything less than what P & P is recommending, and I would urge you to consider that testimony, and urge you to consider the life that he basically took from [S.D.], when you determine the sentence.

(ECF No. 36-10 at 3-6.)

45

Defense counsel argued the recommended sentence in the PSI was harsh and urged the court to sentence some of the counts concurrent:

> In looking at the PSI, obviously it's a very harsh sentence given the fact that P & P is recommending that everything be ran consecutively to one another. I would ask that the Court at least consider giving him concurrent time on some of the counts. I mean we're looking at sexual assault with use of a deadly weapon. This is, just that in amongst itself, is not a life sentence whatsoever; it's mandatory prison. He still will have to go ahead and make parole if that's even an option given how he will act in prison. Either he'll act accordingly and he'll take classes and do whatever he needs to, or he'll never make his parole.
>
> In addition, you know, he still has the possibility of a life sentence on that, so I would leave it up to the discretion of the Department of Prisons and the Parole Board.

(*Id.* at 10.)

The trial court stated, "I would just note that as crimes go this is probably one of the most frightening and horrific I have seen in over 25 years," and "[r]egardless of the victim's status, it was a stranger sexual assault. I don't think it gets, frankly, much worse than that." (*Id.* at 12.) The trial court imposed consecutive sentences for all but the robbery conviction, which runs concurrent with the sentence for first-degree kidnapping. (*Id.* at 10-12.) The aggregate sentence is 62 years and almost one month to life imprisonment. (*Id.*)

### 2. Applicable Legal Principles

The Eighth Amendment forbids sentences that are "grossly disproportionate" to the crime. *Graham v. Fla.*, 560 U.S. 48, 59-60 (2010). In non-capital cases, a court must first compare the gravity of the offense with the severity of the sentence to determine whether it is one of the "rare" cases which leads to an inference of gross disproportionality. *See id.* (citing *Harmelin v. Michigan*, 501 U.S. 957, 1005 (1991) (Kennedy, J., concurring)); *see also Solem v. Helm*, 463 U.S. 277, 289-92 (1983) (citation (explaining that a court weighs the criminal offense and penalty "in light of the harm caused or threatened to the victim or society, and the culpability of the offender" and agreeing that "'[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare . . ..'") (internal citation omitted); *Norris v. Morgan*, 622 F.3d 1276, 1290 (9th Cir. 2010) ("we compare the

harshness of the penalty imposed upon the defendant with the gravity of his triggering offense and criminal history") (citing *Ewing v. California*, 538 U.S. 11, 28-29 (2003); *accord Ramirez v. Warden*, 365 F.3d 755, 767-70 (9th Cir. 2004)).

"In the rare case in which . . . this threshold comparison . . . leads to an inference of gross disproportionality the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Graham*, 560 U.S. at 60 (citation modified). "If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual." *Id.*

The Supreme Court has stated that "[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Solem*, 463 U.S. at 290. Generally, if the sentence imposed does not exceed statutory limits, it will not be overturned on Eighth Amendment grounds. *See United States v. Parker*, 241 F.3d 1114, 1117 (9th Cir. 2001).

### 3.      Analysis of Ground 8

On direct appeal, the NCA held: "Porter's sentence is not cruel or unusual as it falls within statutory guidelines and is not grossly disproportionate to Porter's crimes. *See Chavez v. State*, 213 P.3d 476, 489-90 (2009)." *Porter v. State*, No. 70663, 2017 WL 1806817, at *2 n.2 (Nev. App. Apr. 28, 2017).

Porter contends this Court must conduct *de novo* review of this claim because the NSC failed to apply clearly established federal law as determined by the Supreme Court. (ECF No. 80 at 65-66.) He claims the NCA cited *Chavez*, which relied only on *Harmelin*, and cited no other controlling Supreme Court precedent. (*Id.*) The Supreme Court has explained that "a state court need not cite or even be aware of [the Supreme Court's] cases under § 2254(d)." *Harrington*, 562 U.S. at 98 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002)). Moreover, in *Harmelin*, the Supreme Court cited *Solem* and other cases. *Harmelin*, 501 U.S. at 959-60.

Applying deferential review, the NCA did not unreasonably apply clearly established federal law, as determined by the Supreme Court, to the facts in this case when it determined Porter's sentences fall within the state statutory guidelines and the circumstances do not raise an inference that the aggregate sentence of 62 years and 1 month to life, is grossly disproportionate to the six offenses.

Sexual assault was punishable "by imprisonment in the state prison for life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years has been served." NRS § 200.366(2)(b), *as amended by* Laws 2007, c. 528, § 7. And an enhancement for the use of a firearm or deadly weapon in the commission of the crime, may be punished, in addition to the term of imprisonment prescribed by statute for the crime, in this case, sexual assault, by imprisonment in the state prison for a minimum of not less than 1 year and a maximum of not more than 20 years. NRS § 193.165(1). Porter was sentenced to three consecutive terms of 10 years to life plus 53 to 240 months imprisonment for the convictions for sexual assault with use of a firearm. (ECF No. 36-10 at 10-12.) Thus, his sentences are within the applicable statutory guidelines.

Battery with intent to commit sexual assault was punishable "for a minimum term of not less than 2 years and a maximum term of life with the possibility of parole." NRS § 200.400(4)(b); *see also* NRS § 193.165(1). Porter was sentenced to five years to life imprisonment for the conviction for battery with intent to commit sexual assault, plus 53 to 240 months for the use of the firearm, to run consecutive to the third conviction for sexual assault using a firearm. (ECF No. 36-10 at 10-12.) Thus, the sentence was within the statutory guidelines.

The relevant penalties for first-degree kidnapping were (a) life with the possibility of parole, with eligibility for parole beginning when a minimum of 5 years has been served; or (b) a definite term of 15 years, with eligibility for parole beginning when a minimum of 5 years has been served. NRS § 200.320(2), *as amended by* Laws 2009, c. 42, § 2, eff. May 6, 2009; *see also* NRS § 193.165(1). Porter was sentenced to five years to life imprisonment for the first-degree kidnapping conviction plus 53 to 240 months for the use

of a firearm, to run consecutive to the conviction for battery with intent to commit sexual assault with use of a firearm. (ECF No. 36-10 at 10-12.) Thus, the sentence was within the statutory guidelines.

Robbery is punishable "by imprisonment in the state prison for a minimum term of not less than 2 years and a maximum term of not more than 15 years." NRS § 200.380(2), *as enacted by* Laws 1995, p. 1187; *see also* NRS § 193.165(1). Porter was sentenced to 40 to 80 months for the robbery conviction plus 53 to 240 months for the use of a firearm, to run concurrent with the sentence for first-degree kidnapping with use of a firearm. (ECF No. 36-10 at 10-12.) The sentence was within the statutory guidelines.

Considering the gravity of his triggering offenses as explained by the sentencing court, the State, and S.D., alongside Porter's criminal history, including his pending cases and that he committed these offenses less than a month after his parole expired, it was objectively reasonable for the NCA to conclude this is not a rare instance in which the harshness of the penalty imposed raises an inference of grossly disproportionate sentencing. Ground 8 is denied.

## V.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Porter. Rule 11 of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA. Therefore, the Court has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner made "a substantial showing of the denial of a constitutional right." For claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA issues only if reasonable jurists could debate whether (1) the petition states a valid claim of the denial of a constitutional right, and (2) this Court's procedural ruling was correct. *Id.* Applying these standards, a COA is warranted for Grounds 1, 4, 5, 7, and 8.

## VI.   CONCLUSION[8]

It is hereby ordered that the Third Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 27) is denied.

It is further ordered that Grounds 1.1(B) and 1.2 of the Petition are dismissed with prejudice as technically exhausted by procedural default.

It is further ordered that all requests for an evidentiary hearing are denied.

It is further ordered that a Certificate of Appealability is granted for Grounds 1, 4, 5, 7, and 8, and denied for all other grounds in the Petition.

It is further ordered that the Clerk of Court substitute Nethanjah Breitenbach for Respondent Garrett.

It is further ordered that the Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 24th Day of March 2026.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

---

[8]The Court notes the parties made arguments and cited cases not discussed above. The Court reviewed these arguments and cases and determined they do not warrant discussion as they do not affect the outcome of the issues before the Court.